UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PAUL OTTO,

                Plaintiff,

-vs-                                  Case No.  5:13-cv-311-Oc-10PRL

CHRIS BLAIR, in his official capacity as
Sheriff of Marion County, JASON
WILLIAMS, ORA BERRY, RAYMOND
Piotti, and JOSEPH TUSSEY,

                Defendants.
_____/

## ORDER ON SUMMARY JUDGMENT

Plaintiff Paul Otto has filed a six-count Complaint against the Defendants, the Sheriff of Marion County and four officers, alleging violations of his Eighth, Fourth, and Fourteenth Amendment rights, as well as several state law tort claims (Doc. 1).  Mr. Otto contends that he was subjected to unconstitutionally excessive force during the course of his arrest on June 18, 2010, and during his subsequent incarceration at the Marion County Jail.

On June 30, 2014, the Court dismissed without prejudice all claims against Officer Jason Williams, granted summary judgment as to the wrongful arrest claim against Deputy Joseph Tussey (Count II), and dismissed all 42 U.S.C. § 1983 official capacity claims against Captain Ora Berry, Sergeant Raymond Piotti, and Deputy Tussey (Docs. 34-35). What remains are a § 1983 excessive force and cruel and unusual punishment claim against Marion County Sheriff Chris Blair, Sergeant Piotti, and Deputy Tussey (Count I),

a state law claim for battery against Captain Berry, Sergeant Piotti, and Deputy Tussey (Count III), an intentional infliction of emotional distress claim against Captain Berry and Sergeant Piotti (Count IV), a gross negligence claim against Captain Berry, Sergeant Piotti, and Deputy Tussey (Count V), and a negligence claim against Sheriff Blair (Count VI).

The case is presently before the Court on the Defendants' motion for summary judgment (Doc. 36), to which the Plaintiff has filed a response in opposition (Doc. 41). Upon due consideration, and for the reasons discussed below, the Court finds that the motion for summary judgment is due to be granted in part and denied in part.

## Undisputed Material Facts

### I.   Paul Otto's Arrest

On June 18, 2010, Defendant Joseph Tussey, a deputy with the Marion County Sheriff's Office, responded to a call of a disturbance in progress. Nina Peters, Mr. Otto's girlfriend, had reported that Mr. Otto was at her residence and was attempting to gain entry without her permission.[1]  As he responded to the address, Deputy Tussey received information that Mr. Otto was driving a black SUV, had left the location of the incident, and was possibly en route to his home. Shortly thereafter, Deputy Tussey observed a black SUV matching the description of Mr. Otto's vehicle traveling in the opposite direction. The

---

[1]Mr. Otto testified at his deposition (Deposition of Paul Otto, Doc. 36-2, pp. 41-42, "Otto Dep."), that immediately before his arrest, he went by Ms. Peters' home to bring her flowers, but that she refused to allow him entry.  He denies trying to force entry into her house.

SUV crossed the double yellow line with both drivers side tires as the driver rounded a curve in the road.

As the vehicle went by his patrol car, Deputy Tussey recognized Mr. Otto and turned around to follow him with the intent to attempt a traffic stop.  Mr. Otto increased his speed and made a right turn onto SW 73rd Avenue.  Deputy Tussey followed Mr. Otto at a distance of several car lengths, with both his lights and siren activated.  Mr. Otto turned into the residential driveway at his home, located at 10680 SW 73rd Avenue, Ocala, Florida.  Deputy Tussey also turned into the driveway.  He turned his siren off but left his lights on.

Mr. Otto drove up the driveway and into the attached garage.  He got out of his vehicle and Deputy Tussey got out of his patrol car.  Deputy Tussey claims he yelled out "Stop, Sheriff's Office," but Mr. Otto testified that he did not hear anything.  Mr. Otto walked around the front of his SUV towards the door leading into his home.  Deputy Tussey followed him, and when Mr. Otto reached the door, Deputy Tussey grabbed him and brought him back into the garage.  He then leaned Mr. Otto up against the front of his SUV.

When Deputy Tussey placed his hands on Mr. Otto, he began to resist by tensing up his arm muscles and trying to pull away.  Deputy Tussey grabbed him around the torso and told him to stop resisting.  Mr. Otto did not comply, and Deputy Tussey forced him onto the floor of the garage.  Mr. Otto then placed his hands underneath his body so Deputy Tussey could not handcuff him.  Deputy Tussey placed his hand on Mr. Otto's shoulder blades and pressed down with his body weight.  He also warned Mr. Otto that he would deploy his taser if Mr. Otto did not comply.  Mr. Otto eventually brought his hands around

to his back and Deputy Tussey handcuffed him.  Mr. Otto refused to comply with Deputy Tussey's verbal commands and refused to walk to the patrol car, so Deputy Tussey had to pick Mr. Otto up and drag him to the patrol car.

During this engagement, Deputy Tussey detected a very strong odor of alcohol on Mr. Otto.  He also noticed that Mr. Otto's eyes were bloodshot and watery, that he was slurring his words, and that his clothing was dirty and his front pants zipper was down. Deputy Tussey then placed Mr. Otto under arrest for Resisting an Officer Without Violence, and transported Mr. Otto to jail.  At the jail, Mr. Otto failed a series of field sobriety tests and provided a breath sample that registered at .253/.265, more than three times the legal limit in Florida.  Mr. Otto was subsequently charged with Driving Under the Influence.

At his deposition, Mr. Otto admitted that he was an alcoholic for at least seven to eight years prior to his arrest.  He also admitted that he was drinking whiskey on June 18, 2010, the day he was arrested (Otto Dep., pp. 33-34, 41-42).  He testified that he did not notice Deputy Tussey until he grabbed him in his garage; he was not aware that Deputy Tussey had been following him, and did not see any patrol car lights or hear any siren.  He claims that Deputy Tussey entered his garage and slammed him to the ground, and that he landed on his left elbow, causing it to swell.  Although Mr. Otto also testified that he did not resist Deputy Tussey in any way, he admits that he was not fully cooperative, and that he refused to walk over to Deputy Tussey's patrol car (Otto Dep., p. 48).

The Court has the benefit of the video recording from Deputy Tussey's dashboard camera (Doc. 38).[2]  The recording, which includes audio, begins as both Mr. Otto and Deputy Tussey drove onto the driveway of Mr. Otto's home.  Deputy Tussey's patrol car lights were activated and were reflected in the back of Mr. Otto's car.  Mr. Otto got out of his car, turned and saw Deputy Tussey, but continued to walk toward the door to his house.  Deputy Tussey walked toward Mr. Otto who was in front of his SUV.  They are both partially blocked from camera view for approximately 5 seconds, during which time Deputy Tussey tried to grab Mr. Otto.  Mr. Otto appeared to resist, and a slight struggle ensued, after which Deputy Tussey grabbed Mr. Otto around the torso and they both fell to the ground.  Deputy Tussey was positioned on top of Mr. Otto, who was lying on his stomach.

Deputy Tussey immediately got off of Mr. Otto, but kept his knee in Mr. Otto's back and a hand between his shoulder blades.  He repeatedly asked Mr. Otto for his hands so he could be handcuffed.  Mr. Otto, who by this time had placed his hands under his stomach, continuously refused to comply with Deputy Tussey's commands.  After more than a minute of resisting, during which time Deputy Tussey warned Mr. Otto that he would be tasered if he did not comply, Mr. Otto finally relented and gave Deputy Tussey his hands.  Mr. Otto was then handcuffed with his hands behind his back.  During this entire

---

[2]There are no allegations or suggestions that this videotape was doctored or altered in any way, and Mr. Otto has not challenged its authenticity.  The Court will rely on the videotape, to the extent that it clearly depicts a scene or scenes that directly contradicts the testimony of Mr. Otto concerning the same event(s).  See Scott v. Harris, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1775-76 (2007); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290  n. 3 (11th Cir. 2009).

encounter, Mr. Otto repeatedly said "no," "I don't want to go to jail," and "I just want to go home and go to bed."

Deputy Tussey tried to help Mr. Otto stand up, but Mr. Otto again refused to comply. Deputy Tussey eventually dragged Mr. Otto by the back of his arms out of the garage to the side of the patrol car. Mr. Otto finally stood up, and was searched and placed into Deputy Tussey's patrol car. At no point in time did Deputy Tussey kick or hit Mr. Otto, nor did he ever deploy his taser, use pepper spray, or use any other weapons.[3]

On October 15, 2010, Mr. Otto pleaded nolo contendere to both charges of Driving Under the Influence and Resisting Arrest Without Violence. (Doc. 11, Ex. 1). He was sentenced to 270 days imprisonment in the Marion County Jail (Id.).

## II.   Paul Otto's Incarceration

Mr. Otto began serving his sentence at the Marion County Jail on October 15, 2010. He was soon thereafter assigned to E pod, a section of the Jail where inmates who held jobs in the jail reside. On November 12, 2010, Mr. Otto complained to Corrections Officer Thomas Moats that the phone in E Pod was not working. Mr. Otto testified that Officer Moats cursed at him and refused to fix the phone.[4] Mr. Otto then turned and walked away,

---

[3]The dashboard camera continued to record until Mr. Otto arrived at the Marion County Jail for processing. The camera recorded Mr. Otto admitting that he saw the flashing patrol car lights when they both pulled into the driveway. The camera also recorded Mr. Otto complaining of pain in his wrists due to the handcuff, and Deputy Tussey attempting to adjust the handcuffs.

[4] Officer Moats' incident report states that he told Mr. Otto that he would turn the phone on in a few minutes (Doc. 36-10).

muttering "what a jerk" under his breath.[5]  Officer Moats immediately came out of his office, slammed Mr. Otto onto the ground, handcuffed him, and removed him to H Pod.  Mr. Otto contends that Officer Moats' attack came out of the blue, although he admits that he refused to put his arms behind his back for handcuffing when Officer Moats requested that he do so (Otto Dep., pp. 61-62).  Mr. Otto claims he re-injured his left elbow and asked for medical attention, but that his request was denied.[6]

Mr. Otto spent 30 days in solitary confinement, at the conclusion of which he was transferred to a substance abuse treatment program for approximately four months.  After he finished the treatment program, he was returned to the Marion County Jail to complete his sentence.

On April 13, 2011, Mr. Otto was assigned to A Pod.   Around 11 a.m. that day, another inmate, James Evans, walked up to Mr. Otto and punched him in the head.  There was no advance warning, no provocation, and no history of prior aggression between Mr. Otto and Mr. Evans.  Mr. Otto immediately reported the incident to the corrections officers on duty, and Mr. Otto was taken to the infirmary for evaluation.  Mr. Evans was arrested and charged with Battery on an Inmate and Resisting Arrest Without Violence.  Mr. Evans

---

[5]Officer Moats noted in his incident report that Mr. Otto yelled "fucking jerk."

[6]Officer Moats incident report states that Mr. Otto was seen by a nurse, who noted no injuries (Doc. 36-10).  The incident report further states that Officer Moats first asked Mr. Otto to leave the area near his office, and when Mr. Otto refused, he tried to handcuff him.  Mr. Otto refused to comply and jerked his arm way.  Officer Moats then forced Mr. Otto onto the floor and applied a pressure point technique to the back of Mr. Otto's ear until he complied.  Officer Moats then handcuffed Mr. Otto without further resistance.  (Id.).  In any event, Mr. Otto has not asserted any claims against Officer Moats, and he is not a defendant in this case.

was reassigned to another section of A Pod, and Mr. Otto concedes that he never had any further interaction with Mr. Evans during his incarceration (Otto Dep., pp. 87-88).

## III.   The August 23, 2011 Event

While an inmate at the Marion County Jail, Mr. Otto was required to attend weekly AA classes from 7 p.m. to 8 p.m. every Tuesday.  Inmates who attend classes while in jail are required to check in and check out before leaving their pods.  Each class is called separately, and the inmates line up at the entrance to the pod, and are checked out before leaving.  On August 23, 2011, Mr. Otto was housed in E Pod.  Mr. Otto heard an officer announce a few minutes after 7 p.m. that it was last call for all classes.  Mr. Otto walked up to the door, got in line, and walked out of the pod with other inmates.  However, the AA class had not yet been called out, and no officer checked him off on the attendance sheet.  Rather, it appears that Mr. Otto simply walked out of the pod with other inmates and proceeded to his AA class in B pod on the second floor.[7]

The officers quickly realized that Mr. Otto was missing from E Pod and had not checked out.  They called for a halt to all inmate activity while they searched for him.  About 15 minutes after he arrived at the class, a female officer came in and asked if Mr. Otto was there.  He responded in the affirmative, and the female officer left.   Approximately 15 minutes after that the same officer came back and told Mr. Otto he needed to return to E Pod immediately.  At this point, the record testimony differs drastically.

---

[7]The Defendants state that Mr. Otto was actually found in an AA class being held in C Pod.

Mr. Otto contends that as he began walking back to E Pod, he encountered three corrections officers:  Defendants Sergeant Piotti and Captain Berry and Officer Jason Williams.  Captain Berry was the Watch Commander on August 23, 2011 and was in charge of the entire jail.  Mr. Otto testified that Officer Williams immediately began to curse and scream in Mr. Otto's face, saying "what the hell do you think you're doing being in AA meetings; you don't have the right to be in there."  (Otto Dep., p. 82).  Mr. Otto responded by asking Officer Williams to "please be kind."  He informed Officer Williams that "I'm required to be here every Tuesday night.  There's some mistake."  Mr. Otto further stated "I can show you  I have – I'm required to be here."  (Id., pp. 72, 82).

Mr. Otto testified that either Officer Williams or Sergeant Piotti then told him he was going to back to E Pod to pack up his belongings, and that he was being taken off of "trustee status" and transferred to another Pod.  Mr. Otto said "this is wrong, I'm where I'm supposed to be."  Officer Williams then placed a handcuff on one of his wrists, and started to slap him, threw him to the ground, and pepper sprayed him in his face.  (Otto Dep., pp. 72-75, 82).  Mr. Otto covered his face with his hands in self defense, and denies resisting the officers at any point in time.  According to Mr. Otto, he was calmly talking to the officers, he never raised his voice, never refused to obey directions, and never cursed, but the officers suddenly attacked him.

While Mr. Otto was on his stomach with his face covered to counteract the effects of the pepper spray, he claims that Sergeant Piotti deployed his taser into his back.  Officer Williams then grabbed Mr. Otto's right leg, lifted it up into the air, twisted it, and then laid

forward on top of Mr. Otto with his entire body weight.  (Otto Dep., pp. 78-79).  After Mr. Otto had been pepper sprayed and tasered, the officers were able to secure Mr. Otto and handcuff him.  Mr. Otto repeatedly testified that at all times he was compliant, was not aggressive or resistant, and that the officers' actions were unprovoked.

The Defendants have submitted the affidavits of Sergeant Piotti and Captain Berry (Docs. 36-6, 36-8), as well as a copy of the Incident Report (Doc. 36-6, Exs. 1-3), which paint a vastly different picture of the events in question.  According to these documents, Captain Berry was in her office on August 23, 2011 when Officer Williams informed her that Mr. Otto was missing.  The Defendants ultimately learned that Mr. Otto was attending an AA class, and Officer Williams requested that Mr. Otto be brought back to E Pod immediately to follow proper checkout procedure.

Captain Berry, along with Officer Williams and Sergeant Piotti stated walking over to C Pod, and encountered Mr. Otto in the hallway.  Officer Williams told Mr. Otto to return to E Pod to pack up his things because he was being removed from inmate worker status, and transferred to another Pod.  Mr. Otto became agitated, said "You're fucking crazy" and refused to return to E Pod.  Officer Williams then told Mr. Otto to go to A Pod instead for confinement.  Mr. Otto became even more agitated, refused to go, and again said "You're fucking crazy."

At this point Sergeant Piotti instructed Mr. Otto to turn around and put his hands behind him so that he could be handcuffed and escorted to A Pod.  Mr. Otto told Sergeant Piotti "You're fucking crazy," and refused to put his hands behind his back.  Sergeant Piotti

warned that if Mr. Otto did not comply, he would be pepper sprayed. Sergeant Piotti was then able to handcuff Mr. Otto's left wrist, but Mr. Otto forcefully pulled away. Officer Williams took Mr. Otto to the floor to control him, and Sergeant Piotti pepper sprayed him in the face. Mr. Otto continued to resist and became more aggressive, placing his hands under his body to avoid being handcuffed. Sergeant Piotti warned Mr. Otto that if he did not put his hands behind his back, he would be tasered. Mr. Otto still refused to comply, and Sergeant Piotti discharged his taser once into Mr. Otto's back. Mr. Otto then became compliant, and the officers were able to secure Mr. Otto with handcuffs. The Defendants contend that at all times Mr. Otto was combative and resistant, and that the force used was reasonably necessary to affect his arrest.

Once Mr. Otto was placed in handcuffs, the parties agree that Sergeant Piotti and Officer Williams escorted Mr. Otto to A Pod and placed him in a shower, while fully clothed and still in handcuffs, for 15 minutes for decontamination from the pepper spray. The Defendants state that they left Mr. Otto restrained because he was still agitated. While he was in the shower, Mr. Otto overheard Sergeant Piotti laughing and telling Officer Williams "I should have shot him again, I think he wanted it again." (Otto Dep., p. 81).

After Mr. Otto had spent 15 minutes in the shower, Sergeant Piotti and Officer Williams removed the handcuffs. A nurse removed the taser hooks from Mr. Otto's back and conducted a medical examination. The nurse did not note any injuries, and Mr. Otto was placed on a 45 minute observation log, during which time he was checked on every 15 minutes. At the conclusion of this 45 minute period, Mr. Otto was placed in a cell

without further incident.  Mr. Otto claims that he suffered an injury to his left elbow and right knee, and requested an MRI of his knee, which was denied.[8]

It is undisputed that Captain Berry did not participate in any of the events on August 23, 2011.  She was a bystander and observed Officer Williams and Sergeant Piotti arrest Mr. Otto.  At no point did Captain Berry attempt to intervene or prevent the use of either the pepper spray or the taser.  She watched the officers escort Mr. Otto to A Pod and then returned to her office.

## IV.   Post August 23, 2011 Events

As a result of the August 23, 2011 incident, Mr. Otto was charged with three violations of Jail policies: (1) conduct which disrupts or interferes with security; (2) unauthorized absence from assigned area; and (3) disobeying written or verbal orders (Doc. 36-6, Ex. 1).  He was found guilty and sentenced to 30 days lockdown and loss of all gain time.  (Id.).

Mr. Otto was also charged with one count of the crime of Resisting or Obstructing Officers Without Violence.  He pleaded nolo contendere, and he was adjudicated guilty on October 4, 2011 (Doc. 36-7).  Mr. Otto was ordered to serve 45 days in the Marion County Jail, although he received credit for 43 days time served, and was fined $388.50 (Id.).

Once Mr. Otto was released from Jail, he continued to suffer from pain in his left elbow and right knee.  He eventually was diagnosed with a torn meniscus in his right knee

---

[8]Mr. Otto has not asserted any denial of medical care, deliberate indifference, or medical negligence claims.

and had surgery to repair it in either November or December 2011.  He also had surgery

on his left elbow in February 2012.   Mr. Otto claims that he continues to suffer from pain

in his elbow, that his knee is stiff, and that he cannot run, squat, or crawl on the floor.  He

also testified that he can no longer work due to the emotional and psychological stress  he

continues to suffer as a result of the August 23, 2011 incident.  Mr. Otto further testified that

he takes medication to deal with these emotional and psychological issues, and is under

the care of a medical professional.

## V.    Marion County Sheriff's Office Policies

At all relevant points in time, the Marion County Sheriff's Office had in place policies

governing the following issues: (1) use of force; (2) use of restraints, including handcuffs;

(3) the use of chemical agents such as pepper spray; (4) the use of electronic disabling

devices such as tasers; (5) the reporting and investigation of use of force incidents; (6)

decontamination procedures for when a person is exposed to chemical agents; and (7) the

use of force training provided to all officers.  (Doc. 36-13, Exs. 5-9; Doc. 42-2).

Operations Directive 4030.00 provides that "Officers shall use only that degree of

force necessary to perform their official duties, and shall not strike or use physical force

against any person except when necessary in the performance of official duties."  (Doc. 36-

13, Ex. 5, p. 1; Doc. 36-13, Ex. 6, p. 1; Doc. 42-2, p. 1).

On June 18, 2010, the date of Mr. Otto's arrest, Operations Directive 4030.00

included a Recommended Use of Force/Levels of Resistance Matrix, which "[was] meant

13

to be used as a guideline for an officer to select effective reasonable and legal force options in a verbal or physical encounter.  As a subject increases his/her resistance level from verbal to physical, an officer may have to increase the level of his/her response until the resistance ceases and the officer is able to gain control of the subject.  As soon as the point of subject compliance is reached, the officer must de-escalate his/her response level to the minimum force necessary to control the subject."  (Id.).

The Recommended Use of Force/Levels of Resistance Matrix provided that an employee of the Sheriff's Office may use force, including restraint devices, take downs, and pain compliance, on persons who were verbally resisting and engaging in passive physical resistance.  (Doc. 36-13, Ex. 5, p. 14; Doc. 42-2, p. 14).  Passive physical resistance was defined as "[a] subject physically refuses to comply or respond.  He/she does not make any attempt to physically defeat the actions of the officer but forces the officer to employ physical maneuvers to establish control."  (Id., p. 15).  Take downs were defined as "[t]echniques that redirect, in a controlled manner, a subject to the ground in order to limit his/her physical resistance and to facilitate the application of a restraint device.  (Id., p. 16).  Pain compliance was defined as "[t]echniques that force a subject to comploy with an officer as a result of the officer inflicting controlled pain upon specific points in the subject's body, such as pressure point techniques and or the use of o.c. spray."  (Id.).

The Matrix permitted additional levels of force such as the use of counter moves, and intermediate weapons, when a person begins to actively physically resist.  (Id.).  Passive physical resistance is defined as where "[a] subject physically refuses to comply or

14

respond.  He/she does not make any attempt to physically defeat the actions of the officer but forces the officer to employ physical maneuvers to establish control."   (Id., p. 15). Active physical resistance is defined as when "[a] subject makes physically evasive movements to defeat an officer's attempt at control.  This may be in the form of bracing or tensing, attempts to push/pull away or not allowing the officer to get close to him/her." (Id.). Counter moves are defined as "[t]echniques that impede a subject's movement toward an officer or others; such as blocking, striking, distracting, kicking, parrying, dodging, weaving, redirecting, or avoiding, followed by appropriate controlling techniques." (Id., p. 16).

On October 1, 2010, the Sheriff's Office revised its use of force policy (Doc. 36-13, Ex. 6).  This revised policy was in effect on August 23, 2011.  The revised policy removed the Recommended Use of Force/Levels of Resistance Matrix, replacing it with "Force Guidelines" which provides "a framework for making decisions involving the reasonable use of force by officers." (Doc. 36-13, Ex. 6, pp. 14-16).  The Force Guidelines define "passive resistance" and "active resistance" largely the same as they were defined in the Matrix. However, the Force Guidelines no longer identify the type of force that may be used in response to a specific level of resistance.  Instead, the Force Guidelines direct an officer to consider the totality of the circumstances to determine the level of force that is reasonable and necessary.  (Id., pp. 15-16).

In addition to submitting copies of these policies, the Defendants have submitted the Affidavit of Lieutenant Richard Englebright, who oversees the Training Division of the Sheriff's Office (Doc. 36-13).  Lt. Englebright avers that Captain Berry, Sergeant Piotti, and

Deputy Tussey each completed a basic skills course, and each received and completed annual training on the use of tasers, as well as biennial training on the use of non lethal weapons (Id., ¶¶ 6-13).  These Defendants were also up to date on their training at the time of the events in question.  (Id.).[9]  Lt. Englebright further averred that these Defendants were never the subject of any internal investigations.  (Id., ¶ 5).

After the June 18, 2010, November 12, 2010, April 13, 2011, and August 23, 2011 incidents at the Jail described above, the officers involved prepared and filed Incident Reports and Use of Force reports (Doc. 36-6, Exs. 1-3, Doc. 36-9, Doc. 36-10).  Each of the three incidents were investigated, and each time, it was determined that the officers' use of force was reasonable and within all applicable operational guidelines.

### Summary Judgment Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  The

---

[9]Copies of the Defendants' training records were also submitted (Doc. 36-13, Exs. 1-4)

party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248, 106 S. Ct. at 2510.

## Discussion

## I.    The Section 1983 Individual Capacity Claims

In Count I of his Complaint, Mr. Otto alleges a claim of excessive force against Deputy Tussey with respect to his June 18, 2010 arrest, and a claim of cruel and unusual punishment against Sergeant Piotti with respect to the August 23, 2011 incident.  Both Defendants have asserted the defense of qualified immunity.

### A.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional

rights of which a reasonable person would have known.'" Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508 (2002)).  Qualified immunity is an immunity from suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial.  Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985).

To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority. Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the defendant establishes this, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.  Id.  The Supreme Court has established a two-part test to determine whether qualified immunity should apply.  The court must determine whether the plaintiff's allegations, if true, establish a constitutional violation.  Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2514 (2002).  This requires the court to determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  Gonzalez, 325 F.3d at 1234.  The second prong of the test requires the court to determine whether the right was "clearly established" at the time of the violation.  Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)).  Following the Supreme Court's clarification in Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009), these two determinations may be made in either order at the discretion of the court.  Lewis, 561 F.3d at 1291.

There is no dispute that both Deputy Tussey and Sergeant Piotti were at all times acting within their discretionary authority.  Thus, the burden has shifted to Mr. Otto to show that his constitutional rights were violated, and if so, that such rights were clearly established.  The Court finds that Mr. Otto has failed to meet this burden with respect to Deputy Tussey, but satisfied this burden with respect to Sergeant Piotti.[10]

## B.    Deputy Tussey

Mr. Otto alleges that Deputy Tussey engaged in unconstitutionally excessive force when he "tackled Otto onto the ground inside of Otto's residence" during the course of his arrest.  (Doc. 1, ¶ 16).  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002).  See also Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) ( "[C]laims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").  "In determining whether the officers' force was reasonable, [a court] must determine 'whether a reasonable officer would believe that this level of force

---

[10]Mr. Otto's response (Doc. 41) does not address any of the arguments raised in Deputy Tussey's motion for summary judgment.  In fact, the response does not even mention Deputy Tussey's name other than in the introductory paragraph.  Prior to filing his response, Mr. Otto, who is represented by counsel, received a Summary Judgment Notice from the Clerk which advised Mr. Otto that: (1) "failing to respond to this motion will indicate that the motion is not opposed," (2) "all material facts asserted by the movant in the motion will be considered to be admitted by you unless controverted by proper evidentiary materials," and (3) "you may not rely solely on the allegations of the issue pleadings in opposing this motion."  (Doc. 39).

is necessary in the situation at hand.' " Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005).   The court's inquiry focuses on whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (internal citations omitted).

To assess the reasonableness of the force used, "we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007) (quoting United States v. Place, 462 U.S. 696, 703, 103 S. Ct. 2637 (1983)).   This "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.   "[T]he reasonableness of a 'particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " Mercado, 407 F.3d at 1157 (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1872).   The court must also allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872.

Viewing the evidence in the light most favorable to Mr. Otto, the Court finds that Deputy Tussey's actions during the course of Mr. Otto's June 18, 2010 arrest did not violate his Fourth Amendment rights.  To the contrary, Deputy Tussey's actions were reasonable, and the minimal amount of force used was necessary to effect Mr. Otto's arrest.  There is no dispute that Deputy Tussey was lawfully arresting Mr. Otto; therefore he had the right to use that level of force reasonably necessary to effectuate the arrest.  And according to the dashboard video and audio recording, it is clear that Mr. Otto was "actively resisting arrest or attempting to evade arrest by flight." Brown v. City of Huntsville, Ala, 608 F.3d 724, 738 (11th Cir. 2010) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1347-48 (11th Cir. 2002)).

Mr. Otto failed to stop when Deputy Tussey activated his lights and siren, and instead sped up in an attempt to evade Deputy Tussey.  After Mr. Otto got out of his car, he saw Deputy Tussey behind him and chose to continue trying to evade him by walking toward the door of his house.  The undisputed facts further show that when Deputy Tussey attempted to stop and arrest Mr. Otto in his garage, Mr. Otto resisted by pulling away and by refusing to allow Deputy Tussey to handcuff him, and that Mr. Otto continued to resist by failing to comply with Deputy Tussey's numerous requests.  The fact that Deputy Tussey forced Mr. Otto onto the ground – a familiar law enforcement tactic – simply does not equate to unconstitutionally excessive force.[11]  Moreover, the injury claimed – a bruised

---

[11]Mr. Otto is not challenging Deputy Tussey's use of handcuffs, or his dragging of Mr. Otto
(continued...)

21

and swollen left elbow – is not so extensive as to suggest the malicious use of unnecessary force.  See Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.").

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [person's] constitutional rights."  Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1067 (11th Cir. 2000) (internal quotations omitted).  Rather, "[f]ourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Lee, 284 F.3d at 1197 (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72).  In this case, the undisputed material facts show as a matter of law that Deputy Tussey's actions of forcing Mr. Otto to the ground and handcuffing him was both de minimis and necessary to effect Mr. Otto's arrest.  Durruthy v. Pastor, 351 F.3d 1080, 1094-95 (11th Cir. 2003).  There was no violation of Mr. Otto's Fourth Amendment rights and, as such, Deputy Tussey is entitled to qualified immunity.[12]

---

[11](...continued)
to the patrol car – he is only challenging the fact that Deputy Tussey tackled him in his garage. Even if Mr. Otto were to claim these other actions were excessive, his argument would fail as the undisputed material facts clearly demonstrate that all of Deputy Tussey's actions on June 18, 2010 were reasonable and not excessive.

[12]Because there was no constitutional violation, the Court need not consider whether the constitutional right at issue was clearly established.  However, even if the Court were to consider this issue, Deputy Tussey would still be entitled to qualified immunity.  The law in existence as of June 18, 2010 (specifically Supreme Court, Eleventh Circuit, and Florida Supreme Court (continued...)

Summary judgment will be granted in favor of Deputy Tussey on Count I.

## C.   Sergeant Piotti

Mr. Otto's excessive force claim against Sergeant Piotti implicates the Eighth Amendment's prohibition against cruel and unusual punishment because at the time of the events in question, Mr. Otto was a convicted inmate at the Marion County Jail. Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986).  The Eleventh Circuit has described forth the legal structure for such a claim as follows:

Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." Whitley v. Albers, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 1085 (1986) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)); see also Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999-1000 (1992).  To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including:  "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Hudson, at 7-8, 112 S. Ct. at 999; see also Whitley, 475 U.S. at 321, 106 S. Ct. at 1085; Harris v. Chapman, 97 F.3d 499, 505 (11th Cir. 1996).  From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321, 106 S. Ct. at 1085 (quoting Johnson, 481 F.2d at 1033).  Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance.  See Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. 1993), as amended, 14 F.3d 583 (11th Cir. 1994) ("A police officer has a duty to intervene when another officer uses excessive force."); Byrd v. Clark,

---

[12](...continued)
jurisprudence) makes clear that the force used by Deputy Tussey was both lawful and reasonable.

783 F.2d 1002, 1007 (11th Cir. 1986) ("if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983"); Fundiller v. City of Cooper City, 777 F.2d 1436, 1442 (11th Cir. 1985) ("an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance"); Harris v. Chanclor, 537 F.2d 203, 206 (5th Cir. 1976) ("a supervisory officer is liable under [ Section] 1983 if he refuses to intervene where his subordinates are beating an inmate in his presence").

Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002).

Taking the facts in the light most favorable to Mr. Otto, the Court concludes that he has at least created a material issue of fact with respect to whether his Eighth Amendment rights were violated on August 23, 2011.  It is undisputed that at the time of the events in question, at most Mr. Otto was guilty of leaving the E Pod without properly checking out – a minor infraction which Sergeant Piotti himself testified does not always result in any punishment.  (Doc. 36-6, ¶ 5).  It is further undisputed that after encountering Officer Williams and Sergeant Piotti, Mr. Otto was forced to the ground, pepper sprayed in his face, tasered in his back, and suffered a serious knee injury.  It is also undisputed that Sergeant Piotti deployed both the pepper spray and the taser.

What is disputed is the level, if any, of Mr. Otto's resistance immediately preceeding and during his arrest.  On the one hand, the Court has been presented with Mr. Otto's sworn deposition testimony in which he states that he was calm, did not curse, and did not resist in any manner.  He testified that he immediately complied with directions to leave his AA class and return to E Pod, and that he was not acting in an aggressive manner.

24

According to Mr. Otto, it was Officer Williams and Sergeant Piotti who were the aggressors, who attacked him without provocation, and who escalated the use of force in response to a non-resistant inmate.  Mr. Otto further testified that he did not resist in any manner other than by placing his hands over his face in an effort to deflect the effects of pepper spray.  Lastly, Mr. Otto has testified that Sergeant Piotti was joking with Officer Williams immediately after the altercation, and expressed remorse at not tasering Mr. Otto a second time.  These facts, standing alone, are more than sufficient to at least create a question of fact concerning whether Sergeant Piotti applied force in a malicious or sadistic manner.  See Fils v. City of Aventura, 647 F.3d 1272, 1288-89 (11th Cir. 2011); Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002).

On the other hand, the Court has the Affidavits of Sergeant Piotti and Captain Berry, as well as the Incident Reports, which paint a picture of an aggressive, non-compliant, and resistant inmate.  According to Sergeant Piotti, Mr. Otto was cursing, refused to return to E Pod, and continually resisted the application of handcuffs.  In addition, once Mr. Otto had one handcuff on his wrist, he became a danger to the officers due to the possibility that the loose handcuff could be used as a weapon.  Sergeant Piotti further testified that he only used pepper spray and his taser after repeatedly warning Mr. Otto that such force would be used if he failed to comply, and ceased using such force as soon as Mr. Otto was in handcuffs.  The Court also notes that Mr. Otto pleaded nolo contendere to one count of

Resisting or Obstructing Officers Without Violence.[13]  Under these facts, standing alone, it would appear that the  force used was necessary, proportionate to the actions of Mr. Otto, and achieved the desired result – compliance from an inmate.  See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004).

The Court is therefore faced with a classic swearing contest.  In order to find a constitutional violation, the Court would have to accept the testimony of Mr. Otto to the exclusion of the testimony of the corrections officers.  And to find the absence of a constitutional violation, the Court would have to credit Sergeant Piotti's testimony to the exclusion of Mr. Otto's – in other words view the facts in the light most favorable to the Defendant; the exact opposite of the standard of Fed. R. Civ. P. 56.  See Tolan v. Cotton, ___ U.S. ___, 134. S. Ct. 1861 (2014) (vacating and remanding entry of summary judgment in favor of a police officer in a 42 U.S.C. § 1983 excessive force claim where the district court failed to view the evidence at summary judgment in the light most favorable to the nonmoving party).  Rather, such credibility determinations are for the ultimate trier of fact to resolve, not for the Court at summary judgment.  See Terrell v. Smith, 668 F.3d 1244, 1249-50 (11th Cir. 2012) ("In order to overcome summary judgment because of qualified immunity, 'the facts in dispute must raise a genuine issue of fact material to the

_____

[13]The Defendants have not argued that Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994) prohibits Mr. Otto's claim.  See Dyer v. Lee, 488 F.3d 876, 881-82 (11th Cir. 2007) (finding no Heck bar precluding plaintiff who had been convicted of resisting arrest from bringing § 1983 claim for excessive force by police).

determination of the underlying issue.'") (quoting <u>McCullough v. Antolini</u>, 559 F.3d 1201, 1205 (11th Cir. 2009)).[14]

The Court also finds that the law was clearly established as of August 23, 2011 that, assuming Mr. Otto's version of the facts as true, his Eighth Amendment rights were violated. <u>Skrtich</u>, 208 F.3d at 1301 ("a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force maliciously and sadistically to cause harm is clearly established to be a violation of the Constitution by the Supreme Court decisions <u>Hudson</u> and <u>Whitley</u>.).")

Accordingly, summary judgment will be denied as to the excessive force claim against Sergeant Piotti.[15]

## II.    Section 1983 Municipal Liability Claim

In Count I, Mr. Otto also asserts a municipal liability claim against Sheriff Blair in his official capacity, alleging that the purported excessive force he suffered during the course of his arrest, and during the August 23, 2011 incident at the Marion County Jail were caused by a policy, custom, or practice of the Sheriff.

---

[14]Sergeant Piotti cites to <u>Willingham v. Loughnan</u>, 261 F.3d 1178 (11th Cir. 2001), *vacated on other grounds*, 537 U.S. 801, 123 S. Ct. 68 (2002), for the proposition that Mr. Otto's nolo contendere plea to the charge of Resisting or Obstructing Officers Without Violence collaterally estops him from now claiming that he did not resist. <u>Willingham</u> does not, however, preclude Mr. Otto from litigating in this case the degree to which he resisted – and that issue is very much in dispute.

[15]The fact that the Court is denying qualified immunity at the motion for summary judgment stage does not mean that the defense is lost forever. Sergeant Piotti is free to reassert this defense at trial and/or in post trial motions. <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1487-88 (11th Cir. 1996); <u>Kelly v. Curtis</u>, 21 F.3d 1544, 1546-47 (11th Cir. 1994).

Summary judgment is due to be granted as to Mr. Otto's claim against the Sheriff with respect to his arrest by Deputy Tussey because, as discussed at length, *supra*, the undisputed facts demonstrate that Mr. Otto did not suffer any violation of his constitutional rights.  In order to establish municipal liability under § 1983, a plaintiff must first establish that one or more of his constitutional rights were violated.  Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996); Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1211 (11th Cir. 1993).[16]  Summary judgment is also due to be granted as to Mr. Otto's claim against the Sheriff with respect to the August 23, 2011 because he has failed to identify any policy, custom, or practice which caused his injuries.

"For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents."  Owens v. Fulton County, 877 F.2d 947, 951 n. 5 (11th Cir. 1989).  The doctrine of respondeat superior does not apply in actions under § 1983, and a municipality or a government agency "may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom."  Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009).  See also  Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997) ("[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.").  A municipal policy or custom is "a persistent and wide-spread practice."  Church

---

[16]Indeed it appears that Mr. Otto has abandoned this claim as it pertains to Officer Williams. See Doc. 41, p. 10.

v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994).  A plaintiff must establish, not only that the policy or custom existed, but also that "actual or constructive knowledge of such custom" is attributable to municipal officials.  Id.  Therefore, "random acts or isolated incidents" are generally not enough to establish municipal or governmental liability.  Id.

A plaintiff may establish liability pursuant to a municipal policy when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S. Ct. 1292, 1300 (1986). "To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." Griffin v. City of Opa–Locka, 261 F.3d 1295, 1308 (11th Cir. 2001).

Mr. Otto has not pointed to any Sheriff's Office policy relating to the use of force that he contends caused his injuries.  And, he has not provided any evidence of prior incidents of excessive force against inmates that would establish a widespread practice by the Sheriff's Office.  To the contrary, the Sheriff has submitted the affidavit of Lieutenant Englebright (Doc. 36-13), which demonstrates that the Sheriff's Office at all relevant times had in place policies governing the use of force against Jail inmates, and that there was no widespread history of excessive force violations.

Instead, Mr. Otto's claim rests solely on the August 23, 2011 incident itself.  He argues that Sheriff Blair should be held liable because Officer Williams and Sergeant Piotti

used excessive force against him and failed to follow the Recommended Use of Force/Levels of Resistance Matrix. (Doc. 41, p. 10).   This argument fails for several reasons.   First, the Resistance Matrix was no longer in existence as of August 23, 2011 (Doc. 36-13, Ex. 6).   Under the existing use of force policy, Sergeant Piotti was instructed to use the level of force necessary under the totality of the circumstances.   Second, and more importantly, a single event cannot establish a municipal policy or custom.   Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011) ("'Proof of a single incident of unconstitutional activity is not sufficient to impose liability' against a municipality.") (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 105 S. Ct. 2427 (1985)).   "A pattern of similar constitutional violations is ordinarily necessary.   A single incident would not be so pervasive as to be a custom because a custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."   Id. (internal citations omitted).[17]

Summary judgment will be granted in favor of the Sheriff on the municipal liability claim.

---

[17]Although Mr. Otto does not reference them in his response (Doc. 41, p. 10), the other two incidents that occurred during his incarceration are not sufficient to create a custom, policy or practice.  The altercation with inmate James Evans did not involve any use of force by any officer against Mr. Otto, and it is undisputed that Mr. Evans' attack was unprovoked and that no officers had advance knowledge of Mr. Evans' intent to harm Mr. Otto.  The November 2010 incident with Officer Moats was an isolated event and is also insufficient to create a widespread pattern or practice of excessive force against inmates.

### III.    The Battery Claims

In Count III, Mr. Otto alleges a state law claim of battery against Captain Berry, Sergeant Piotti, and Deputy Tussey.  Summary judgment will be granted in favor of Deputy Tussey because under Florida law, Deputy Tussey was entitled to use reasonable force to carry out a lawful arrest without opening himself to individual tort liability.  City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996) ("an officer is liable for damages only where the force used is clearly excessive.").  See also Fla. Stat. § 776.05(1) ("The officer is justified in the use of any force . . . . Which he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm while making the arrest.").  The Court has previously determined that the force used to place Mr. Otto under arrest on June 18, 2010 was reasonable and not clearly excessive.[18]

Summary judgment will also be granted as to Captain Berry as the undisputed facts show that she never touched Mr. Otto, and therefore could not have committed the tort of battery.  "Battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent."  Quilling v. Price, 894 So. 2d 1061, 1063 (Fla. Dist. Ct. App. 2005) (citing Paul v. Holbrook, 696 So. 2d 1311 (Fla. Dist. Ct. App. 1997)).  There was simply no infliction of any contact

---

[18]In addition, Mr. Otto's battery claim against Deputy Tussey cannot go forward because Mr. Otto failed to provide a notice of claim to the Sheriff's Office or to the Department of Insurance as required by Fla. Stat. § 768.28(6).  See Doc. 36-5; Levine v. Dade County School Bd., 442 So. 2d 210, 212 (Fla. 1983).

upon Mr. Otto by Captain Berry.  And it appears that Mr. Otto recognizes this as he does not address his battery claim against Captain Berry in his response.  (Doc. 41, pp. 9-10).

Summary judgment will be denied, however, as to the battery claim against Sergeant Piotti.  "Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest and officers are only liable for damage where the force used is 'clearly excessive.'" <u>Davis v. Williams</u>, 451 F.3d 759, 768 (11th Cir. 2006) (quoting <u>Sanders</u>, 672 So. 2d at 47).  In other words "[i]f an officer uses excessive force, the 'ordinarily protected use of force is transformed into a battery.'" <u>Id.</u> The Court has determined that material issues of fact remain in dispute concerning whether Sergeant Piotti's use of force was excessive.  As such, material issues of fact also remain in dispute as to whether his use of force would be transformed into a battery.

**IV.**    **The Intentional Infliction of Emotional Distress Claims**

Under Florida law, the tort of intentional infliction of emotional distress requires Mr. Otto to prove the following elements:  (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct, *i.e.*, behavior that goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community; (3) the conduct caused the emotional distress; and (4) the distress was severe.  <u>Rubio v. Lopez</u>, 445 Fed. Appx. 170, 175 (11th Cir. Aug. 30, 2011); <u>Liberty Mut. Ins. Co. v. Steadman</u>, 968 So. 2d 592, 594-95 (Fla. Dist. Ct. App. 2007).  In Count IV, Mr. Otto alleges that Captain Berry and Sergeant Piotti "intended to inflict emotional distress upon Otto

through their outrageous conduct, such as verbally assaulting Otto by screaming directly in his face and ears, pepper spraying Otto directly in his face, breaking Otto's leg, breaking Otto's elbow, and all of the other outrageous verbal and physical acts committed against Otto. . . ." (Doc. 1, ¶ 76).

Summary judgment shall be granted in favor of Captain Berry because the undisputed material facts show that she did not engage in any such verbal or physical acts; she was a mere bystander.[19]  Summary judgment shall be denied as to Sergeant Piotti due to the existence of material fact disputes concerning whether his use of force was with the intent to maliciously and sadistically inflict harm upon Mr. Otto, which would clearly also qualify as outrageous conduct.

## V.    The Gross Negligence Claims

In Count V, Mr. Otto alleges that Captain Berry, Sergeant Piotti, and Deputy Tussey engaged in "gross negligence" when they breached their duty to ensure that Mr. Otto was not subjected to excessive force.   Summary judgment is due to be granted as to all Defendants on this claim because Florida does not recognize a claim or cause of action for the negligent use of excessive force.  Sanders, 672 So. 2d at 47-48.  While "a separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force. . . the negligence component must pertain to something other than the actual application of force during the course of

---

[19]Again, it appears that Mr. Otto has abandoned this claim against Captain Berry.  (Doc. 41, pp. 9-10).

the arrest.  It cannot serve as the exclusive basis for liability in an excessive force claim."

Id. at 48.  Here, it is clear from the Complaint and Mr. Otto's response, (Doc. 1, ¶¶ 78-80;

Doc. 41, pp. 8-10), that this gross negligence claim is based exclusively on the Defendants'

purported use of excessive force, and under these circumstances, this claim cannot

proceed.

## VI.     The Negligence Claim Against Sheriff Blair

Mr. Otto's final claim is for common law negligence against the Sheriff, and asserts

that Sheriff Blair breached several duties, causing him harm.  Specifically, he claims that

Sheriff Blair:

> had a positive duty to train his officers and teach them how to respond to field
> and inmate issues.  Further, Blair, as Sheriff of Marion County, had a duty to
> discipline his officers to deter the violent conduct, battery, violation of civil
> rights, and excessive force committed against Otto by Blair's deputies and by
> Marion County jail inmates.  Blair had a duty to exercise reasonable care to
> prevent inmate altercations and violence.  Finally, Blair had a duty to train his
> officers regarding warrantless entries into a private residence without
> justification and in violation of the United States Constitution.  Blair also had
> a duty to clearly delineate and thoroughly implement official policies in the
> department to prevent the kind of conduct alleged in this complaint.

(Doc. 1, ¶ 83).

Lastly, Mr. Otto alleges that Blair "had a positive duty to train the medical staff and

nurses of the Marion County correctional facility to be responsive to the medical needs of

the prisoners and to conduct the medical tests necessary to ensure the inmates safety and

welfare."  (Doc. 1, ¶ 84).  In his response in opposition to summary judgment, Mr. Otto

appears to narrow this claim to a failure to discipline and properly train his officers with respect to Sergeant Piotti's use of force on August 23, 2011 (Doc. 41, p. 11).

Thus at bottom, this is a claim against the Sheriff, in his role as head of a municipal agency, for negligent training and negligent discipline of his officers with respect to the use of force, the prevention of inmate altercations, and the provision of medical care.  Summary judgment is warranted on this claim for several reasons.  First, the Sheriff is protected by sovereign immunity.  Governmental agencies are "immune from tort liability based upon actions that involve its 'discretionary functions.'"  Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001).  The Sheriff's "decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of government discretion regarding fundamental questions of policy and planning."  Id.  Because Mr. Otto is challenging the Sheriff's training decisions, the "discretionary function" exception to the waiver of sovereign immunity applies and this claim is barred.  Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1118-19 (11th Cir. 2005).

Moreover, assuming *arguendo* that this claim is not barred, Mr. Otto has failed to present any evidence establishing (or creating a material issue of fact) that the Sheriff breached any duty, or that any such breach was the proximate cause of Mr. Otto's injuries.  For example, Mr. Otto has not come forth with any evidence establishing, or even suggesting, a lack of training on the part of Deputy Tussey, Sergeant Piotti, Captain Berry, or any other Marion County Sheriff's Office employee.  He also has not come forward with any evidence that would have arguably placed Sheriff Blair on notice of any training

35

deficiencies.  See Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005); Wynn

v. City of Lakeland, 727 F. Supp. 2d 1309, 1317-18 (M.D. Fla. 2010).  Nor has he shown

that Sergeant Piotti, or any other officer, should have been disciplined but was not.  And

Mr. Otto also has failed to demonstrate that the Sheriff was on notice of any officer's

predilection towards violence against inmates prior to August 23, 2011, or that he was on

notice of any inmate's intent to harm Mr. Otto.  Rather, the undisputed material facts show

that each alleged incident involving Mr. Otto was fully investigated and found to have been

handled within the parameters of existing policies and procedures.  Mr. Otto also has not

explained how after-the-fact discipline of Sergeant Piotti, or the lack of it, could have been

the proximate cause of his injuries.  Feliciano v. City of Miami Beach, 847 F. Supp. 1359,

1367 (S.D. Fla. 2012).

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED that the Defendants'

Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  Summary

judgment is GRANTED in favor of Defendants Joseph Tussey and Chris Blair with respect

to Count I of the Complaint (Doc. 1), the excessive force and cruel and unusual punishment

claim.  Summary judgment is also GRANTED in favor of Defendants Joseph Tussey and

Ora Berry with respect to Count III of the Complaint, the state law battery claim.  Summary

judgment is further GRANTED in favor of Defendant Ora Berry on the intentional infliction

of emotional distress claim (Count IV).  Summary judgment is also GRANTED in favor of

Defendants Ora Berry, Raymond Piotti, and Joseph Tussey as to Count V, the gross negligence claim.  Lastly, summary judgment is GRANTED in favor of Defendant Chris Blair on Count VI, the negligence claim.  In all other respects, the motion for summary judgment is DENIED.

The case shall proceed to trial on the remaining claims against Defendant Raymond Piotti:  excessive force and cruel and unusual punishment under 42 U.S.C. § 1983, battery, and intentional infliction of emotional distress.  Finding no just reason for delay, <u>see</u> Fed.R. Civ.P. 54(b), the Clerk is directed to enter judgment in accordance with this Order and the Court's June 30, 2014 Order (Doc. 34).

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 9th day of October, 2014.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya A. McSheehy